IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

FREDA I. TALLEY                )
                              )
v.                            )        Judge Nixon/Bryant
                              )        Case No. 1:05-0039
JO ANNE B. BARNHART, Commissioner )
of Social Security            )


To:  The Honorable John T. Nixon, Senior Judge


## REPORT AND RECOMMENDATION

            This is a civil action filed pursuant to 42 U.S.C.
§405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits ("DIB"), as provided under Title II of the
Social Security Act ("the Act"), as amended.  The case is
currently pending on plaintiff's motion for judgment on the
administrative record (Docket Entry No. 12), to which defendant
has responded (Docket Entry Nos. 19, 20).  Plaintiff has further
filed a reply to plaintiff's response (Docket Entry No. 22).  For
the reasons stated below, the Magistrate Judge recommends that
plaintiff's motion be DENIED, and that the decision of the
Commissioner be AFFIRMED.


## I.  Introduction

            Plaintiff filed her DIB application on September 28,
1998, alleging that she had become disabled on December 31, 1996

1

(Tr. 76-78). Plaintiff alleged that her disabling conditions included congestive heart failure, high blood pressure, stomach ulcer, back problems, bladder infections, sinus infections, hiatal hernia, allergies, asthma, and bronchitis (Tr. 84). The claim was denied at the initial and reconsideration stages of state agency review (Tr. 65-68, 71). Plaintiff thereafter filed a timely request for a hearing before an Administrative Law Judge ("ALJ") (Tr. 73), and the case came to be heard on April 7, 1999, when plaintiff appeared with counsel and testimony was received from plaintiff, her husband, and a friend (Tr. 28-60). On July 26, 1999, the ALJ issued a written decision denying plaintiff's claim for benefits, on the grounds that she was capable of returning to her past relevant work (Tr. 14-21). The Appeals Council declined to review the ALJ's decision (Tr. 5-6).

Plaintiff timely filed suit in this Court (case no. 1:01-0096), seeking judicial review of the Commissioner's final decision. On February 12, 2004, Judge Nixon entered a Memorandum Order remanding the case to the Commissioner for further administrative proceedings (Tr. 377-384). Upon receiving the remanded case, the Appeals Council vacated the original decision and forwarded the file to the ALJ, who was instructed to rehear the case and issue a new decision in light of the Court's instructions on remand (Tr. 400-01).

Plaintiff's second administrative hearing was held

2

before the same ALJ on September 27, 2004 (Tr. 478-489).

Plaintiff again testified, but limited her proof to how her

condition had worsened since the 1999 hearing.  Additional

medical records were received (Tr. 413-14).  Plaintiff's date

last insured for DIB purposes was established during the passage

of time between these two hearings, clarifying the issue for

decision as whether or not disability could be established at any

time prior to June 30, 2002 (Tr. 481).  On December 30, 2004, the

ALJ issued a second written decision denying plaintiff's claim

for benefits (Tr. 315-322).  The ALJ made the following findings:

1.   The claimant met the insured status requirements of the
     Act as of the alleged disability onset date, and
     continued to meet them through June 30, 2002, but not
     thereafter.

2.   The claimant has not engaged in substantial gainful
     activity since the alleged onset date.

3.   The claimant had "severe" impairments by the expiration
     of insured status, including hypertension, moderate
     obesity and recurrent sinus infections.

4.   The claimant's impairments, considered individually and
     in combination, did not meet or equal in severity any
     impairment set forth at 20 CFR Part 404, Subpart P,
     Appendix One by the expiration of insured status.

5.   The claimant's subjective allegations of an onset of
     disabling pain and functional limitations by the
     expiration of insured status are not credible.

6.   The claimant retained the residual functional capacity
     through the expiration of insured status to perform
     medium work not requiring concentrated exposure to
     irritating inhalants.

7.   The past relevant work as a hospital cook was not
     precluded by the residual functional capacity through

3

the expiration of insured status.

8.   The claimant was not disabled within the meaning of the
     Act by the expiration of insured status and is,
     therefore, not entitled to the benefits applied for.

(Tr. 322).

On March 29, 2005, the Appeals Council denied plaintiff's request for review of the decision of the ALJ (Tr. 295-98), thereby rendering that decision the final decision of the Commissioner.  This civil action was thereafter timely filed, and the Court has jurisdiction.  42 U.S.C. § 405(g).  If the Commissioner's findings are supported by substantial evidence, based on the record as a whole, then these findings are conclusive.  Id.

## II.  Review of the Record

The following summary of the record is taken largely from defendant's brief, Docket Entry No. 19 at 3-9.

### A.  Relevant Medical Evidence

The evidence showed that plaintiff had a history of congestive heart failure in the late 1970's (Tr. 41), as well as hiatal hernia, hysterectomy, and cholecystectomy[1] (Tr. 143); bladder repair surgery, a cesarean section, several dilatation

---

[1]A cholecystectomy is surgical removal of the gallbladder.  Dorland's Illustrated Medical Dictionary (Dorland's) 316 (W.B. Saunders Company ed., 28th ed. 1994).

4

and curettage procedures (D and C's),[2] and cyst removal (Tr. 183). She claimed that she had problems with fatigue that began in 1977 but had gotten worse in 1996 (Tr. 106). She alleged sinus infections, back problems, allergies, high blood pressure, headaches, dizzy spells, ear problems, and bleeding around the fingernails (Tr. 114, 116); high cholesterol, swelling in her feet and legs, medication-induced dizziness and stomach cramps (Tr. 124); congestive heart failure, stomach ulcer, bladder infection, hiatal hernia,[3] asthma, bronchitis, and arthritis (Tr. 126-129). She was formally diagnosed with severe hypertension (Tr. 144); recurrent urinary tract infections (Tr. 160); occasional edema[4] (Tr. 162); obesity, atypical chest pain, and possible heart failure (Tr. 172); ear infection (Tr. 202); hypercholesterol (Tr. 206); gastritis (Tr. 208); sinusitis (Tr. 209); and pharyngitis (Tr. 211).

Plaintiff was admitted to the hospital in 1987 for high blood pressure (Tr. 182). She was admitted to the hospital on June 6, 1995, for evaluation of complaints of frequent, intermittent chest pain, dyspnea with exertion, worsening fatigue, and vague abdominal discomfort (Tr. 141-145), and was

---

[2]In the procedure known as a "D and C," the lining of the uterus is curetted (removed with a curet or scraper); also see vacuum curettage. Dorland's at 406.

[3]A hiatal hernia is herniation of an abdominal organ, usually the stomach, through the esophageal hiatus of the diaphragm. Dorland's at 758.

[4]Edema is excessive fluid in subcutaneous tissues. Dorland's at 528.

5

seen by Dr. P. Thomas Causey, Jr., who placed her on a monitored bed and administered aspirin (Tr. 141). She was held for two days and then discharged (Tr. 146-168).

Plaintiff underwent several testing procedures, including echocardiograms[5] on October 19, 1994 (Tr. 173); June 6, 1995 (Tr. 142); December 12, 1995 (Tr. 139); August 20 (Tr. 134); and May 14, 1997 (Tr. 163); a myocardial perfusion scan[6] and graded exercise test for ischemic[7] heart disease on December 12, 1995 (Tr. 137); renal[8] scan with and without Captopril[9] on May 30, 1995 (Tr. 142) and August 11, 1998 (Tr. 183); and pulmonary function tests on August 11, 1998 (Tr. 185-199).

Plaintiff's medications have included Cipro,[10]

---

[5]An echocardiogram is the record produced when the heart walls and other heart parts, as well as neighboring tissues, are recorded by graphing the echo obtained from beams of ultrasonic waves directed through the chest wall. Dorland's at 525.

[6]A myocardial perfusion scan is a scan of the heart obtained through use of a liquid. Dorland's at 1091, 1256.

[7]Ischemic pertains to ischemia, the deficiency of blood to a part. Dorland's at 861.

[8]Renal pertains to the kidney. Dorland's at 1444.

[9]Captopril is prescribed for hypertension. Physicians' Desk Reference ("PDR") 784 (Medical Economics Company, 52d ed. 1998).

[10]Cipro is an antibiotic prescribed for infections of the lower respiratory system, sinuses, etc. The Pill Book ("Pill Book 9th Ed.") 442 (CMD Publishing, 9th ed. 2000).

6

Guanfacine,[11], Axid,[12] Claritin,[13] and Methylprednisolone[14] (Tr. 107-114); Clonidine,[15] Furosemide[16] Sectral,[17] and Potassium (Tr. 125); Premarin,[18] Tagamet,[19] Tetracycline,[20] Librax,[21] and Darvocet[22] (Tr. 131); Tenex[23] (Tr. 142), Norvasc,[24] and Lozol[25] (Tr. 143);

---

[11]Guanfacine is prescribed for hypertension.  <u>PDR</u> at 2431.

[12]Axid is prescribed for ulcers of the stomach and duodenum, as well as GERD (gastroesophageal reflux disease).  <u>Pill Book 9th Ed.</u> at 744-745.

[13]Claritin is an antihistamine.  <u>Pill Book 9th Ed.</u> at 600.

[14]Methylprednisolone is a corticosteroid prescribed for a wide variety of disorders from rash to cancer.  <u>Pill Book 9th Ed.</u> at 262-263.

[15]Clonidine is prescribed for, among other things, high blood pressure. <u>Pill Book 9th Ed.</u> at 231-232.

[16]Furosemide is prescribed for congestive heart failure.  <u>Pill Book 9th Ed.</u> at 592-593.

[17]Sectral is prescribed for high blood pressure and abnormal heart rhythms.  <u>Pill Book 9th Ed.</u> at 8.

[18]Premarin is prescribed for menopausal symptoms and heart disease and osteoporosis in postmenopausal women.  <u>Pill Book 9th Ed.</u> at 389-390.

[19]Tagamet is prescribed for ulcers of the stomach and upper intestine, as well as other disorders such as GERD.  <u>Pill Book 9th Ed.</u> at 207.

[20]Tetracycline is an antibiotic prescribed for various infections.  <u>Pill Book 9th Ed.</u> at 990.

[21]Librax is used to treat peptic ulcer, irritable bowel syndrome, and acute enterocolitis.  <u>PDR</u> at 2521.

[22]Darvocet is an analgesic prescribed for mild to moderate pain.  <u>Pill Book 9th Ed.</u> at 853.

[23]Tenex is used to manage hypertension.  <u>PDR</u> at 2431.

[24]Norvasc is a calcium channel blocker prescribed for angina pectoris, Prinzmetal's angina, and high blood pressure.  <u>Pill Book 9th Ed.</u> at 61.

[25]Lozol is a diuretic prescribed for congestive heart failure, cirrhosis of the liver, hypertension, and other conditions.  <u>Pill Book 9th Ed.</u> at 1000.

Macrodantin[26] (Tr. 158); Pindolol[27] (Tr. 162); Bumex,[28] K-Dur[29] (Tr. 171); Lasix,[30] and Xanax[31] (Tr. 283).

The record reflects that plaintiff and her physicians have searched for a medication she could tolerate which would control her hypertension. There are remarks indicating that her hypertension was difficult to manage (Tr. 143-44, 172), yet there is also evidence that blood pressure read high in the examination room, but not nearly as high as when she was at home or in her primary care physician's office (Tr. 162). Her blood pressure was not elevated at the time of her consultative examination in August 1998 (Tr. 183). While plaintiff complained at times of headache and dizziness which may have been associated with elevated blood pressure, there is no particular evidence of any enduring limitations from this condition.

Plaintiff was treated by Dr. Joel Hensley in Hohenwald,

---

[26]Macrodantin is used to treat urinary tract infections. Pill Book 9th Ed. at 737.

[27]Pindolol is a beta-adrenergic blocking agent prescribed for high blood pressure and abnormal heart rhythms, among other things. Pill Book 9th Ed. at 818.

[28]Bumex is a diuretic prescribed for congestive heart failure and other conditions where it may be desirable to rid the body of excess fluid. Pill Book 9th Ed. at 592-593.

[29]K-Dur is prescribed for low blood-potassium levels and mild hypertension. Pill Book 9th Ed. at 832.

[30]Lasix is another name for Bumex. Pill Book 9th Ed. at 592-593.

[31]Xanax is prescribed for anxiety, tension, fatigue, and agitation, as well as irritable bowel syndrome, panic attacks, depression, and premenstrual syndrome. Pill Book 9th Ed. at 44-45.

8

Tennessee, from 1991 to 1999. Dr. Hensley treated plaintiff for many routine ailments, as well as her complaints of heart problems, shortness of breath, increased blood pressure, bladder problems, headache, dizziness, back pain, and ulcers (Tr. 200-260, 282-85). On April 28, 1999, Dr. Hensley completed an assessment form indicating that plaintiff could sit for 8 hours, stand or walk for 4 hours, and lift no more than 20 pounds (Tr. 280-81).

Plaintiff also received treatment from a chiropractor, Dr. Ronald Graves, from 1997 to 2000. Plaintiff reported to Dr. Graves that she was having trouble with her lower back and left hip and leg, and was experiencing at least moderate pain (Tr. 175). Dr. Graves performed certain tests and commented that plaintiff had acute lower back and sciatic pain with recurring neck pain and headache (Tr. 177-78). Dr. Graves submitted an assessment which was more restrictive than that of Dr. Hensley, in which he opined that plaintiff could lift no more than 10 pounds on an occasional basis, less than that on a frequent basis, and that she could sit and walk for up to four hours apiece, but could do "little to no standing" (Tr. 293). Dr. Graves further opined that plaintiff's condition is chronic and progressive in nature, and that she is not capable of sustaining a full-time work schedule (Tr. 294).

Plaintiff was seen by Dr. Darrel Rinehart in August

1998, for a consultative examination at government expense (Tr. 182-84).  After conducting a physical examination which he remarked was "completely normal," Dr. Rinehart opined that plaintiff should be able to "sit, stand, lift, walk, etc. for 8 hours in an 8-hour work day" (Tr. 184).

During and after the September 27, 2004, hearing, plaintiff's attorney submitted additional medical evidence (Tr. 415-477).  Virtually all of this evidence was generated after June 30, 2002, the date plaintiff was last insured.  However, one report, which was submitted during the hearing, was a hospital report covering August 1, 2001, to August 11, 2001 (Tr. 422-429). According to this evidence, plaintiff had been admitted to the hospital because her family was concerned about her altered mental status (Tr. 422).  After observation and testing, plaintiff's doctors determined that she had experienced adverse side effects from her medications, likely resulting from a mixture of newly-introduced drugs of Inderal[32] and Biaxin[33] in combination with her currently prescribed drugs (Tr. 428).  Her medications were adjusted, a neurologist ruled out the possibility of any underlying psychiatric problems, and plaintiff was discharged (Tr. 426-429).

---

[32]Inderal is prescribed for, among other things, high blood pressure. The Pill Book ("Pill Book 10th Ed.) 884 (CMD Publishing, 10th ed. 2002).

[33]Biaxin is an antibiotic.  Pill Book 10th Ed. at 239.

10

Plaintiff also submitted the results of magnetic resonance imaging of her lumbar spine, which revealed disc bulges and "advanced degenerative changes at the facet joints" (Tr. 430-31). This test was conducted in August 2002, some two months after plaintiff's date last insured for benefits.

B. Vocational and Other Evidence through June 30, 2002

Plaintiff was born on July 10, 1938 (Tr. 76). She had completed the eleventh grade (Tr. 88). She had a grown daughter who was married and on her own, and she lived with her husband (Tr. 43). She testified that she and her husband visited with friends only occasionally (Tr. 47-49), but she also indicated elsewhere that she enjoyed occasional church get-togethers, visited her daughter and her family, and visited her sister (Tr. 105). Her daily activities included cooking breakfast,[34] sweeping the floor, dust mopping, dusting, some flower gardening, walking outside, reading the Bible, working on puzzle books, and mending clothes (Tr. 45-47). She also went grocery shopping with her husband, did the laundry and ironing, washed the dishes, watched television, sewed embroidery projects, and cleaned the bathroom, although she sometimes needed help with the shower and tub (Tr. 102, 104-105). She was able to drive herself short distances into town to run errands, pay bills, or visit a local

_____

[34]Plaintiff also indicated on a fatigue questionnaire she completed on June 30, 1998, that she usually prepared two meals a day (Tr. 104).

11

beauty shop, but she stated that she could not drive longer distances because her blood pressure would go up (Tr. 48, 102). She usually attended church on Sundays (Tr. 48). She was a church greeter once a month and she visited sick church members in their homes (Tr. 106).

Plaintiff worked as a full-time cook for several employers, including a community hospital from July 1982 to November 1987; a deli restaurant from December 1987 until July 1988; and most recently, the community hospital where she worked from August 1988 until January 1996 (Tr. 94). In 1996, plaintiff was laid off when the food service at this hospital was closed (Tr. 33, 18). Plaintiff also worked at a senior citizen's center from April 1996 until June 1996 and a café from October 1997 until 1998 (Tr. 94).

### III.  Conclusions of Law

#### A.  <u>Standard of Review</u>

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. <u>Jones v. Sec'y of Health & Human Servs.</u>, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. <u>Landsaw v.</u>

12

<u>Sec'y of Health & Human Servs.</u>, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 389 (6th Cir. 1999)(<u>citing</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." <u>Bell v. Comm'r of Soc. Sec.</u>, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. <u>Her</u>, 203 F.3d at 389 (<u>citing</u> <u>Key v. Callahan</u>, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. <u>Hurst v. Sec'y of Health & Human Servs.</u>, 753 F.2d 517, 519 (6th Cir. 1985).

B. <u>Proceedings at the Administrative Level</u>

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level

13

of review, the claimant's case is considered under a five-step

sequential evaluation process, as follows:

(1)  If the claimant is working and the work constitutes
     substantial gainful activity, benefits are automatically
     denied.
(2)  If the claimant is not found to have an impairment which
     significantly limits his or her ability to work (a "severe"
     impairment), then he or she is not disabled.
(3)  If the claimant is not working and has a severe impairment,
     it must be determined whether he or she suffers from one of
     the "listed" impairments[35] or its equivalent; if a listing
     is met or equaled, benefits are owing without further
     inquiry.
(4)  If the claimant does not suffer from any listing-level
     impairments, it must be determined whether the claimant can
     return to the job he or she previously held in light of his
     or her residual functional capacity (e.g., what the claimant
     can still do despite his or her limitations); by showing a
     medical condition that prevents him or her from returning to
     such past relevant work, the claimant establishes a <u>prima
     facie</u> case of disability.
(5)  Once the claimant establishes a <u>prima</u> <u>facie</u> case of
     disability, it becomes the Commissioner's burden to
     establish the claimant's ability to work by proving the
     existence of a significant number of jobs in the national
     economy which the claimant could perform, given his or her
     age, experience, education, and residual functional
     capacity.

<u>Moon v. Sullivan</u>, 923 F.2d 1175, 1181 (6th Cir. 1990).

     The Commissioner's burden at the fifth step of the

evaluation process can be carried by relying on the medical-

vocational guidelines, otherwise known as "the grid," but only if

the claimant is not significantly limited by a nonexertional

impairment, and then only when the claimant's characteristics

identically match the characteristics of the applicable grid

---

[35]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P,
Appendix 1.

14

rule.  Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id.  In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony.  See Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. § 423(d)(2)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

## C.  Plaintiff's Statement of Errors

Plaintiff alleges that the ALJ erred (1) in finding her cardiac, urological, and lower back problems to be nonsevere impairments; (2) in failing to give appropriate deference to the opinions of the treating physician, Dr. Hensley, and the treating chiropractor, Dr. Graves; (3) in finding that her subjective allegations were not credible; and, (4) in finding that she could return to her past relevant work in light of her RFC for medium work, when her past relevant work was incorrectly classified

15

under the Dictionary of Occupational Titles ("DOT") as "hospital cook," and the conflicting evidence of the weight that was lifted by plaintiff in that job calls into question the appropriateness of its classification as "medium" work. As explained below, the undersigned does not find legal error in any of the foregoing respects.

As an initial matter, plaintiff attacks the ALJ's decision as being motivated by his arbitrary and capricious "determin[ation] that he was not going to award this elderly claimant disability benefits" (Docket Entry No. 13 at 30), and that as the means to that end he discounted her credibility because he did not want to believe her (id. at 27), found her able to perform her past relevant work "because it was the only way for him to deny a claim of a sixty-year-old with severe impairments" (id. at 13), and virtually ignored this Court's order of remand by "simply reword[ing] his earlier opinion to reach the pre-ordained result" (id. at 12). While recognizing plaintiff and her counsel's frustration with the administrative process and product following this Court's remand of her case in 2004, the undersigned takes a dim view of the tenor of these remarks. In fact, Judge Nixon's remand of this case was because of a lack of clarity in the expression of the ALJ's reasoning, such that the Court was "unable to evaluate, beyond mere conjecture, whether the ALJ's findings are supported by

16

substantial evidence in the record." (Tr. 380). In remanding for a clarification of ambiguous reasoning, without ordering that any of the disputed findings be set aside or that any further fact-finding or development of the record be had (except with respect to the chiropractor's records, which were not before the ALJ at the time of his first decision), this Court in fact *required* the ALJ to "reword" his prior decision if nothing changed his mind about the ultimate conclusion of no disability. While Judge Nixon is of course the final arbiter of the extent to which his remand instructions were followed, the undersigned would conclude that they were, and that the supplemental decision of the ALJ is adequately reasoned and substantially supported.

Plaintiff further asserts a preliminary argument regarding the Commissioner's "heavier burden when denying disability to older claimants," citing Preslar v. Sec'y of Health & Human Servs., 14 F.3d 1107, 1111 (6th Cir. 1994). The placement of plaintiff's argument and citation (Docket Entry No. 13 at 13) suggests that this heavier burden should be taken into account as part of the court's review for substantial evidence. However, this was plainly not the context in which the "heavier burden" language was employed in Preslar. Indeed, as both Preslar and the Commissioner's regulations make clear, this heavier burden does not apply to the Commissioner's determinations during the first four steps of the sequential

Case 1:05-cv-00039   Document 24   Filed 09/29/06   Page 17 of 32 PageID #: 104

evaluation process, when plaintiff bears the burden of proof, but only at step five of the process, when the burden of proof transfers to the Commissioner. Id. at 1110-11. Even then, the escalating impact of age as a vocational factor is accounted for in the regulations which pertain to the step five inquiry, 20 C.F.R. §§ 404.1560(c)(1), 404.1563, rather than being an independent element which must be weighed in the substantial evidence analysis. The ALJ here, in finding that plaintiff was capable of returning to her past relevant work, was not even bound to consider the impact of vocational factors outside of plaintiff's RFC, much less contend with any burden of proof made heavier by plaintiff's advanced age. 20 C.F.R. § 404.1560(b)(3).

### 1. Nonsevere Impairments

Plaintiff contends that the ALJ employed an erroneous standard when he found that her cardiac, urological, pulmonary, and back impairments were "not shown to have significantly impacted functioning" and therefore were not "'severe,' as that term is defined under the Act." (Tr. 320). Plaintiff cites the definition of a nonsevere impairment as only a slight abnormality which would have no more than a minimal effect on the ability to work. E.g., Salyers v. Sec'y of Health & Human Servs., 798 F.2d 897, 901 (6th Cir. 1986). Plaintiff's argument appears to be that an impairment may have an insignificant impact on functioning, but still have more than a minimal effect on the

18

ability to work. However, the Commissioner's regulations provide that "[a]n impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). "Basic work activities" are then defined in terms of functional abilities which are necessary to perform most jobs, including the physical ability to walk, stand, sit, lift, push, pull, reach, carry, and handle. 20 C.F.R. § 404.1521(b). Given these regulatory provisions, the undersigned cannot find legal error in the ALJ's statement that certain impairments were nonsevere because they were not shown to have significantly impacted functioning.

Moreover, the ALJ plainly understood that establishing the presence of a severe impairment is no more than a *de minimis* hurdle for claimants in the disability determination process, as he recognized "the broad parameters by which [severity] is defined under the Act." (Tr. 318). In light of those parameters, the ALJ found that plaintiff's cardiac, urological, pulmonary, and back impairments were nonsevere. With respect to the first three impairments referenced, the undersigned concludes that substantial evidence supports the finding of nonseverity, as neither the evidence cited by plaintiff in her brief (Tr. 141, 160, 416, 426) nor any other record evidence establishes more than a rather uneventful history of said impairments, or less

19

than adequate control of symptoms through prescription medication
or other measures such as reduction of water intake for
plaintiff's urological complaints.

However, with respect to plaintiff's low back
impairment, it appears that the ALJ erred in his finding of
nonseverity.  While the ALJ aptly noted that the medical evidence
predating plaintiff's date last insured was unimpressive for any
enduring limitations related to plaintiff's back complaints, his
observation that the scan taken two months after plaintiff's date
last insured "revealed no significant stenosis or disc
herniations" is partly inaccurate and wholly inconsistent with
the minimal threshold that is the severity determination.  First,
the MRI dated August 29, 2002, revealed "moderate left
neuroforaminal stenosis" at the L5-S1 interspace (Tr. 430-31).
Second, the ALJ's reliance on the absence of any evidence of disc
herniation is misplaced with respect to the severity
determination, which should have been guided by the findings of
mild to moderate stenosis resulting from bulging discs at
multiple levels of the lumbar spine and moderate to advanced
degenerative changes at the facet joints (id.).  While these
findings were not made until two months after plaintiff's date
last insured, the progressive nature of facet degeneration, which
was "advanced" as of August 2002, should have led the ALJ to find
a medically determinable back impairment which more than

20

minimally impacted plaintiff's functional abilities during her
insured period, at least that portion of the period which
postdates her treatment by Drs. Hensley and Graves (ending March
1999 and February 2000, respectively).[36]  Cf. Blankenship v.
Bowen, 874 F.2d 1116, 1122 (6th Cir. 1989)(faulting the ALJ for
"erroneously failing to draw any inferences" as to claimant's
condition prior to the expiration of insured status, when a
medical report dated five months after the insured period
established claimant's inability to work due to a "slowly
progressive" impairment).

        Though it was error to exclude plaintiff's back
impairment from among the impairments deemed severe, the ALJ did
account for some reduction in plaintiff's exertional abilities,
relying on the state agency physicians' assessments which
accorded partial credibility to plaintiff's pain complaints in
concluding that she was restricted to medium work activities (Tr.
263, 271).  Therefore, the undersigned must conclude that the
error at step two of the sequential evaluation process was
harmless.

                2.  Treating Source Opinions

        In arriving at the determination that plaintiff was
able to engage in medium work, the ALJ considered the opinions of

_____

        [36]As explained infra, during the period of plaintiff's treatment by Drs.
Hensley and Graves, there does not appear to have been any medically
determinable impairment to plaintiff's back, but only plaintiff's report of
symptoms.

plaintiff's treating physician Dr. Hensley, her chiropractor Dr. Graves, a consulting physician, and two non-examining state agency physicians. The two state agency physicians shared the opinion that plaintiff was exertionally limited to medium work, and the ALJ adopted that opinion in his RFC finding, while rejecting the consulting physician's opinion as overly optimistic and the opinions of Drs. Hensley and Graves as inconsistent with their treatment records. In so doing, the ALJ is alleged to have violated the treating physician rule, which states that the opinions of treating physicians are entitled to substantial deference due to the physicians' greater familiarity with the patient and the longitudinal perspective which they gain through months or years of attempting to cure the patient. E.g., Walker v. Sec'y of Health & Human Servs., 980 F.2d 1066, 1070 (6th Cir. 1992). Plaintiff further argues that "[a]s a matter of fact, reports of non-examining physicians cannot constitute substantial evidence to support a denial of benefits in the face of contrary proof from physicians who have actually seen the claimant." (Docket Entry No. 13 at 18)(citing Shelman v. Heckler, 821 F.2d 316, 321 (6th Cir. 1987)).

However, the proposition that reports of non-examining physicians cannot amount to substantial evidence in the face of contrary, treating physician reports only obtains where the treating physician reports are not otherwise appropriately

discounted.  In both <u>Shelman</u>, 821 F.2d at 321, and the case which it relied upon, <u>Broughton v. Heckler</u>, 776 F.2d 960, 962 (11th Cir. 1985), the courts of appeals recognized that the opinions of treating physicians could be rejected for good cause shown, but held that the contrary reports of non-examining sources could not **alone** provide such good cause.  <u>Accord</u> <u>Spencer v. Heckler</u>, 765 F.2d 1090, 1094 (11th Cir. 1987)("Thus, reports of physicians who do not examine the claimant, taken alone, do not constitute substantial evidence on which to base an administrative decision."); <u>Lester v. Chater</u>, 81 F.3d 821, 831 (9th Cir. 1995)(same).  Since the administrative decisions before them failed to cite any reasons for discounting the treating physicians' opinions other than the contrary reports of non-examining sources, the courts of appeals found that an erroneous legal standard had been applied with respect to the findings of the treating physicians.  <u>Shelman</u>, 821 F.2d at 321; <u>Broughton</u>, 776 F.2d at 962.

On the other hand, where the treating physician's assessment is not "supported by detailed, clinical, diagnostic evidence in his reports[, t]his would be a sufficiently valid reason not to accept the opinions of a treating medical doctor." <u>Walters v. Comm'r of Soc. Sec.</u>, 127 F.3d 525, 530 (6th Cir. 1997); <u>e.g.</u>, <u>Shelman</u>, 821 F.2d at 320-21 ("[T]he opinion of a treating physician is entitled to substantial deference only if

23

it is supported by sufficient medical data[.]").  Therefore, it is not necessarily error to discount the opinion of a treating physician whose notes do not adequately support the assigned restrictions, in favor of the opinion of a non-examining physician whose assignment of restrictions is supported by substantial evidence on the record as a whole.  <u>Matelski v. Comm'r of Soc. Sec.</u>, 1998 WL 381361, *5 (6th Cir. June 25, 1998).

Plaintiff argues that Dr. Hensley's treatment notes were unreasonably held against him, stating that the ALJ "expected the notes of the treating physician to somehow chronicle, at each step of the treatment, specific reasons why the [plaintiff] meets the Social Security definition of disability," and that he "was expecting a primary care physician to be documenting limitations in treatment notes, apparently in anticipation that those records would be reviewed in a disability evaluation process."  (Docket Entry No. 13 at 20-21).  However, though mindful of the practical concerns raised by plaintiff regarding a physician's note taking, the undersigned must conclude that it was not unreasonable for the ALJ to scrutinize Dr. Hensley's notes as he did, in light of the aforementioned requirement that sufficient medical data support the treating physician's opinion.  If such data is not to be found in the treating physician's notes, and is not otherwise apparent in the record, then that physician's opinion is not entitled to any

24

particular deference as compared with contrary opinions which are adequately supported. While Judge Nixon's order of remand notes that the absence of such data from Dr. Hensley's assessment form would not undermine the assessment rendered (Tr. 380), the law is clear that the absence of such data from the doctor's treatment notes may in fact justify the rejection of his assessment.

Plaintiff's back pain and fatigue are barely mentioned in over seven years worth of Dr. Hensley's treatment notes (Tr. 202-260, 282-85), which primarily reference plaintiff's recurrent sinus problems and medical management of her hypertension symptoms. As the ALJ noted, those notes contain no recent reference to any complaints of back pain or pain-related limitations, no prescriptions for relief of pain, and no reference to any uncontrolled symptoms of any other impairment which would correlate with the significant exertional restrictions assessed by Dr. Hensley. In the absence of any apparent medical data or other explanation for the restrictions Dr. Hensley assessed, the ALJ was not bound to defer to his assessment versus the assessments of the non-examining physicians and the consultative examiner (whose assessment, though rejected by the ALJ as overly optimistic, is nonetheless a medical source opinion based on a "completely normal" physical examination (Tr. 182-84)).

Plaintiff argues that the ALJ erred in according no

25

weight to the assessment of plaintiff's chiropractor, Dr. Graves
(Tr. 293-94), who assigned restrictions more limiting than those
assigned by Dr. Hensley.  Under the regulations, chiropractors
are not "acceptable medical sources" capable of establishing the
existence of a medically determinable impairment, but are "other
sources" which may be considered in determining the severity of
an established impairment.  20 C.F.R. § 404.1513.  As such, the
Sixth Circuit has noted that "the ALJ has the discretion to
determine the appropriate weight to accord a chiropractor's
opinion based on all evidence in the record..."  Walters, 127
F.3d at 530.  As the ALJ noted, Dr. Graves' treatment notes are
not particularly impressive for unresolved back pain or related
issues, and "[o]ther treatment records further show that x-rays
or scans were not even deemed warranted for diagnostic purposes
related to a back impairment before August 2002, two months after
insured status expired..." (Tr. 319).  As this statement
intimates, no impairment to plaintiff's back was appropriately
established during the time that she was being treated by Drs.
Hensley and Graves, 20 C.F.R. § 404.1508, and Dr. Graves was not
qualified for these purposes to establish the existence of the
"L4 Grade 1 spondylolisthesis," sciatica, or "loss of C curve"
referenced in his notes (Tr. 177-78).  The ALJ observed this lack
of qualification (Tr. 319, citing 20 C.F.R. § 404.1513), but
still compared Dr. Graves' records and assessment to the other

26

medical evidence of record as he was required to do.  <u>Bradford v.</u>
<u>Sec'y of Health & Human Servs.</u>, 803 F.2d 871, 873 (6th Cir.
1986).  Thus, the ALJ did not abuse his discretion nor did he
otherwise lack substantial evidentiary support when he accorded
no weight to Dr. Graves' assessment.

In view of the lack of support for the assessments of
Drs. Hensley and Graves, the undersigned must conclude that
substantial evidence supports the ALJ's determination of
plaintiff's RFC for medium work, based on the reports of the non-
examining physicians.

### 3.  <u>Plaintiff's Credibility</u>

Plaintiff alleges that the ALJ erred in discounting her
credibility based on what she argues to be an insignificant range
of daily activities, particularly since her testimony and that of
her husband has been consistent throughout the administrative
process.  The ALJ acknowledged that plaintiff's range of daily
activities during her insured period (including occasional
driving, household chores such as meal preparation, laundry,
washing dishes, sweeping, dusting, mopping and working in her
flowers) did not indicate regular exertion at the level required
by medium work, but found that they did indicate an ability to
perform most routine household activities (Tr. 317).  The ALJ
further noted that plaintiff stopped working in 1996 because she
was laid off, not because of her ailments, though she testified

27

that her increasing pain and fatigue would have forced her to stop working soon thereafter even had she not been laid off; that Dr. Hammons' note from May 1997 indicated that she was "taking care of a lady who had a stroke"; and that her efforts to control the alleged pain involved the use of mild medications -- primarily over-the-counter buffered aspirin, with the prescription medication Darvocet (a mild narcotic) being provided in 1999 for use as needed -- and rest being the only non-medicinal approach to symptom relief. (Tr. 317).

While plaintiff points out the questionable value of the isolated notation that she was taking care of a lady who had a stroke, as well as the limited extent to which she could engage in the daily activities identified, the undersigned must conclude that the ALJ's explanation of his credibility finding and the items upon which he relied satisfy the substantial evidence standard. Plaintiff posits that "[t]here is no explanation in the record to follow up on Dr. Hammons' offhanded comment and it is impossible to know what 'taking care' means; it could mean that a lady was visiting with the Talleys while she recovered from a stroke or it could mean, as the Administrative Law Judge seemed to suggest, that she was running a nursing home and performing Herculean physical feats for an incapacitated neighbor." (Docket Entry No. 13 at 26, n.12). Whether the fact of this matter lies in either extreme or somewhere in the middle,

28

the ALJ did not err in considering the matter conspicuous by its absence from plaintiff's reports and testimony, and in weighing it among the factors identified as detracting from plaintiff's credibility. While plaintiff argues that lay testimony which is consistent with the medical evidence must be credited, it does not appear that plaintiff's testimony is entirely or even predominantly consistent with the medical evidence, which, as noted above, contains few references to plaintiff's fatigue, pain, or inability to function. The ALJ's credibility finding is to be accorded "great weight and deference," Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003), and the undersigned concludes that it cannot be set aside on the record before this Court.

### 4. Plaintiff's Past Relevant Work

Plaintiff takes issue with the ALJ's finding that her past relevant work corresponds with the Dictionary of Occupational Titles ("DOT") listing of cook in the hotel and restaurant industry, a medium job. A claimant is deemed able to return to her past relevant work if she can perform that work either as it is generally performed in the national economy, or as she actually performed it in the past. Garcia v. Sec'y of Health & Human Servs., 46 F.3d 552, 556-57 (6th Cir. 1995). Judge Nixon's remand order required further administrative development of the extent to which the demands of plaintiff's

29

past relevant work as she actually performed it fit within her residual functional capacity (Tr. 381-82). On remand, the ALJ noted that plaintiff's reports as to the heaviest weight she had to lift in the performance of her past job varied significantly, but found that the greatest weight reportedly lifted, fifty pounds, would fit within the definition of medium work, as plaintiff testified that she did not have to lift that much every day (Tr. 482). The ALJ further found, based on plaintiff's report, that the weight that she frequently had to lift did not exceed twenty-five pounds (Tr. 95), also within the requirements of medium work.

The ALJ relied upon plaintiff's testimony at both hearings and elsewhere in the record in establishing the weight-lifting requirements of plaintiff's past job as she actually performed it (Tr. 316).[37] He relied upon the reports of two agency vocational specialists, who compared plaintiff's report of past job duties and requirements as a cook/kitchen worker in a hospital with the DOT listing for the medium job of hotel/restaurant cook (Tr. 120-23), in establishing the requirements of plaintiff's past job as it is generally performed in the economy (Tr. 316). The undersigned cannot conclude that

_____

[37]While plaintiff argues here that substantial evidence does not support the finding that her past job required no more than medium exertion, she argued before the Appeals Council in 1999 that "her work was at least of the light exertional level and perhaps medium exertional level because of the weight which she lifted." (Tr. 277).

the ALJ was required to go further and enlist an independent vocational expert to testify at government expense, merely to clarify whether the duties which plaintiff previously performed in addition to cooking, i.e., washing pots and dishes, setting up trays, and doing "general kitchen activities" (Docket Entry No. 13 at 28), would equate to the DOT's description of such extraneous duties as "procur[ing] food from storage" and "using variety of kitchen utensils and equipment," etc. <u>Dictionary of Occupational Titles</u>, 313.361-014 (4th ed. 1991). It is plaintiff's burden to prove that she is incapable of performing her past relevant work. <u>Her v. Comm'r of Soc. Sec.</u>, 203 F.3d 388, 391 (6th Cir. 1999). The ALJ's finding that plaintiff did not meet that burden is supported by substantial evidence.

In sum, the undersigned must conclude that substantial evidence supports the ALJ's decision that plaintiff was not disabled prior to June 30, 2002. That decision should therefore be affirmed.

### IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Any party has ten (10) days from receipt of this Report

and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Cowherd v. Million</u>, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

          **ENTERED** this 29th day of September, 2006.


         s/ John S. Bryant
        JOHN S. BRYANT
        UNITED STATES MAGISTRATE JUDGE

32